UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Carbon Investment Partners, LLC, and Carbon Master Fund, L.P.,<br><br>          Plaintiffs,<br><br>   v.<br><br>Shira Elizabeth Bressler,<br><br>          Defendant. | Case No:  1:20-cv-3617<br><br>**COMPLAINT FOR FRAUD, AIDING AND ABETTING FRAUD, AND FRAUDULENT CONVEYANCE**<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiffs Carbon Investment Partners, LLC, ("Carbon GP"), as general partner of Carbon Master Fund, L.P. (the "Carbon Fund," and together with Carbon GP, the "Fund" or "Carbon"), bring this Complaint against Defendant Shira Elizabeth Bressler ("Defendant") and allege as follows:

## INTRODUCTION

1. Plaintiffs Carbon GP and Carbon Fund are an Oklahoma-based investment fund. The Fund brings this action against Defendant – the spouse of the Fund's disloyal former Chief Investment Officer Lee Bressler – because Defendant participated in and aided Mr. Bressler's against the Fund, causing more than $12 million in damages.

2. The Fund has already obtained a fraud judgment against Mr. Bressler in Oklahoma state court (the "Judgment").  The Judgment found that Mr. Bressler set up secret accounts without the Fund's knowledge and used them to take speculative investment positions that violated the Fund's conservative investment policies.  The Judgment also found that unbeknownst to the Fund, Mr. Bressler put up Fund's money as collateral for the bets he was making in the secret accounts – all of which he lost and then tried to cover-up.  The Judgment further found that Mr. Bressler concealed the fact that he intended to use the proceeds from these bets to pay off over a million dollars in personal loans.

1

3. Defendant participated in and aided Mr. Bressler's fraud by forging his signature on documents that purported to give Mr. Bressler the authority to unilaterally approve withdrawals from the Fund's prime brokerage account. Defendant forged Mr. Bressler's signature at his express request. Mr. Bressler then sent the forms to the Fund's prime broker Jefferies LLC, which accepted them. Documents show that Mr. Bressler intended to use this authority to fraudulently wire assets out of the Fund and direct them to accounts of the benefit of himself, Defendant, and his family.

4. Defendant is a sophisticated transactional attorney at Latham & Watkins, LLP, and knew that neither she nor Mr. Bressler were authorized to sign documents purporting to give Mr. Bressler sole authority to approve withdrawals from the Fund's prime brokerage account. Defendant knew this because she reviewed the Fund's operating agreement in detail. That agreement—which Defendant signed and acknowledged reading—required that any such decision be approved by the Fund's managing board.

5. The Judgment also found that Mr. Bressler lied to investors by informing them that the fund was performing well in January 2018, when in fact it was incurring substantial losses in the fraudulent side accounts. Defendant participated in and aided Mr. Bressler's fraud by editing his communications with Carbon investors containing these misrepresentations.

6. When the Fund discovered Defendant and Mr. Bressler's fraud, it sent Defendant a litigation hold letter demanding that Defendant preserve all relevant evidence. Defendant responded by fraudulently transferring hundreds of thousands of dollars into trusts created for that purpose.

7. The Fund accordingly brings this action to remedy its damages caused by Defendant's participation in and aiding of Mr. Bressler's fraud, and to unwind Defendant's fraudulent transfers intended to frustrate the Fund's recovery.

**PARTIES**

8. Plaintiff Carbon GP is a limited liability company organized under the laws of the State of Delaware and headquartered in Oklahoma City, Oklahoma. None of the members of Carbon GP are domiciled in the State of New York.

9. Plaintiff Carbon Fund is a limited partnership organized under the laws of the State of Delaware and headquartered in Oklahoma City, Oklahoma. None of the limited partners of Carbon Fund are domiciled in the State of New York.

10. Defendant Shira Elizabeth Bressler is an individual who resides in in New York City, New York, in Manhattan's Upper East Side.

11. Non-party Lee Alexander Bressler ("Mr. Bressler") is an individual who resides in the Upper East Side of the Borough of Manhattan, in New York City, New York. Mr. Bressler is Defendant's husband and the former Chief Investment Officer of the Fund. The District Court of Oklahoma County has entered a $16 million final judgment against Mr. Bressler, which found that Mr. Bressler had defrauded and breached his fiduciary duties to the Fund.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

13. This Court is empowered to exercise general personal jurisdiction over Defendant because Defendant is domiciled in the State of New York.

14. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides within the Southern District of New York.

**STATEMENT OF FACTS**

15. The Fund brings this suit to remedy the complete destruction of their Oklahoma-based investment Fund by Mr. Bressler's fraud, which was aided and abetted by Defendant.

**A.    The Creation, Purpose and Operations of the Fund**

16. The Fund was founded in late 2016 and was intended to be a conservative, market-neutral hedge fund with an emphasis on capital preservation. The Fund's investment mandate

included objective restrictions on volatility, net exposure, and position size. One of these restrictions was that no more than ten percent of invested capital could be held in any single investment. **Exhibit 1** (Judgment) ¶ a.

17. The Fund's market-neutral, capital preservation investment strategy was confirmed and described in numerous communications between Carbons' principals, investors and service providers, as well as the Fund's private placement memorandum. *Id*. ¶¶ e-f.

18. The Fund's operating agreement designated the Fund's seed investor Rick Nagel as the Fund's Manager, with exclusive decision-making authority over material events, including the Fund's strategy, operations, brokerage accounts and contracts. *Id*. ¶ b.

19. Mr. Bressler was a member of Carbon GP and the Fund's Chief Investment Officer and portfolio manager. Mr. Bressler managed the Fund's day-to-day trading operations. The Fund's Chief Risk Officer, Brandon Bradford, frequently reviewed the Fund's primary account and discussed the portfolio with Mr. Bressler to ensure that it was in line with the conservative strategy outlined in the Fund's private placement memorandum and marketing materials. *Id*. ¶ c.

20. Carbon GP's risk management efforts were extensive, and included retaining independent fund administrators to review trading; using Bloomberg's industry-leading risk analysis platform to review the Primary Account's portfolio; conducting weekly team calls regarding Fund disclosed performance and operations; reviewing monthly reports and memos regarding the Fund's disclosed performance; discussing and reviewing Bressler's trading in the Primary Account; monitoring and instructing Bressler to adhere to the Fund's position sizing, volatility limits and exposure rules, and reprimanding and punishing Bressler when he violated these restrictions; and establishing Fund policies that prohibited opening new accounts or other material actions without the approval of the Fund's manager (Nagel); and engaging Bradford, an experienced hedge fund portfolio manager, as the risk officer tasked with monitoring Bressler. *Id*. ¶ d.

21.     The Fund also engaged experienced professionals including a third-party fund administrator (initially NA V Consulting, later SS&C); prime broker (Jefferies); experienced fund lawyers (Cole-Frieman & Mallon LLP); and auditor (Richie May). *Id*. ¶ g.

22.     The Fund began trading in November 2016. *Id*.

**B.     Mr. Bressler Exploits Backward-Facing Accounting Structures to Defraud the Fund**

23.     In April and May of 2017, Bressler executed trades outside the Fund's mandate and incurred losses. Bressler drafted and sent a memo to Nagel and Bradford that apologized for these losses, explaining that "[t]hey are my fault and thus my responsibility to bear." Bressler committed to investing more money into the Fund to cover the losses, and to refrain from trading options for the foreseeable future. Bressler also told the Fund that trading activities had paused while the Fund determined the most tax-efficient way to insulate the Fund's limited partners from the unauthorized trades and resulting losses. *Id*. ¶ o.

24.     The Fund, in conjunction with NAV and its counsel, determined that the tax-efficient way to insulate the limited partners was to place the securities obtained in the unauthorized trades in a "side pocket" accounting structure that only Bressler, Nagel, and Bradford would participate in (and thereby absorb the losses). As required by its fiduciary obligations, the Fund offered its limited partners the opportunity to participate in the side pocket; however, the Fund recommended that limited partners not participate since the purpose of the side pocket was only to hold and insulate the losses incurred due to Bressler's unauthorized trades. No limited partner chose to participate in the side pocket accounting structure. *Id*. ¶ p.

25.     The purpose of the side pocket accounting structure was purely backwards facing, *i.e.*, to hold and isolate the unauthorized losses from the Fund's limited partners. The side pockets were not intended to be trading vehicles moving forward. *Id*. ¶ q.

26.     Without the knowledge or approval of the Fund's Manager or Chief Risk Officer, Mr. Bressler used the side-pocket structure to open new trading accounts with the Fund's prime broker, Jefferies (the "Secret Accounts") in late 2017.  No capital was invested in the Secret

Accounts; instead, they traded on margin using the Fund's Primary Account as collateral. Mr. Bressler opened these accounts with Jefferies' assistance even though the Fund's Operating Agreement required the Fund's Manager to approve the opening of any new trading account. *Id*. ¶¶ q-s.

27. Mr. Bressler's trading in the Secret Accounts violated the Fund's limits on trade exposure, Jefferies' internal rules regarding margin trading, and FINRA Rules. Neither Mr. Bressler or Jefferies informed the Fund of the Secret Account's existence or Mr. Bressler's trading violations. *Id*. ¶¶ t-u.

28. Mr. Bressler's trading within the Secret Accounts was for his own personal benefit. Mr. Bressler used the Secret Accounts so that his unauthorized trading would not be discovered by the Fund. *Id*. ¶¶ s, v.

### C. Defendant Forges Documents Giving Mr. Bressler Single-Signatory Authority to Wire Money Out of the Fund's Prime Brokerage Account

29. On January 12, 2018, Mr. Bressler asked Defendant to forge signatures on documents authorizing Mr. Bressler to transfer funds from the Fund's prime brokerage accounts without requiring a second signature. **Exhibit 2**.

30. Defendant knew Mr. Bressler was not authorized to alter his wiring authority under the Fund's operating agreement because Defendant had edited, reviewed, and signed that agreement. Nevertheless, Defendant forged the documents as Mr. Bressler requested, and sent Mr. Bressler a photograph of the documents using her phone. Mr. Bressler then forwarded the photo of the documents to the Fund's prime broker, which accepted the form. **Exhibit 3**.

31. Now empowered to wire his fraudulent gains out of the Fund for his own benefit, Mr. Bressler began making risky bets within the Secret Accounts that ultimately destroyed the Fund.

32. On January 22-24, 2018, Mr. Bressler gained $4.2M in the Secret Accounts by trading Netflix options, representing a nearly 50% gain in the entire Fund. Mr. Bressler did not inform the Fund of these gains. **Exhibit 1** ¶ w.

33. On January 24, 2018, Mr. Bressler informed Northern Trust via email that "I am planning to replay the entire loan from Northern Trust in the next 1-2 weeks." Northern Trust is the administrator of a trust of which Mr. Bressler is a beneficiary, and had lent $1.4 million to Mr. Bressler. *Id.* ¶ x.

34. On January 31, 2018—just days before the Fund's collapse—Mr. Bressler instructed the Fund's administrator to wire $200,000 into his Northern Trust account. *Id.* ¶ bb.

### D. The Fund Collapses While Mr. Bressler Lies to Investors with Defendant's Assistance

35. With Defendant's assistance, Mr. Bressler misrepresented the Fund's performance to the market, the Fund's investors and potential investors. On January 29, 2018, Defendant edited an investor letter drafted by Mr. Bressler claiming that the Fund's "returns in Q4 2017 were 7.3%, net of all fees." **Exhibit 4**.

36. Mr. Bressler sent the January 29 letter to potential investors to induce their investment in the Fund.

37. In fact, Mr. Bressler had lost nearly $1 million of the Fund's capital during the last quarter of 2017 as a result of trading in the Secret Accounts.

38. On information and belief, Defendant agreed to assist Mr. Bressler's fraudulent activities in an attempt to obtain new investment that would conceal the Fund's losses caused by Mr. Bressler's fraud, save Mr. Bressler's job with the Fund, and provide Mr. Bressler opportunities to wire his fraudulent gains out of the Fund and to accounts benefitting Mr. Bressler and Defendant.

39. In January and February 2018, Mr. Bressler entered a series of trades in the Secret Accounts that exceeded the Fund's total assets under management by up to 3,000%. These trades resulted in the loss of all invested capital and destroyed the Fund. *Id.* ¶ dd.

### E. Mr. Bressler Destroys Evidence of Defendant's Participation in the Fraud

40. On March 2, 2018, the Fund sued Mr. Bressler for fraud and breach of fiduciary duty in Oklahoma state court and obtained a preliminary injunction requiring Mr. Bressler to

preserve and turn over the Fund's electronic data. That action was then stayed in favor of a AAA Arbitration.

41. Mr. Bressler violated numerous discovery orders issued by the AAA Arbitrator. Mr. Bressler's refusal to comply with discovery orders led the Arbitrator to sanction Mr. Bressler and order Mr. Bressler to turn over his laptop to Carbon for forensic imaging and keyword searches by March 4, 2019.

42. On the evening of March 3, 2019, Mr. Bressler installed the forensic deletion software CCleaner on his laptop and used it to destroy the files stored therein. The AAA Arbitrator found that Mr. Bressler's destruction of his laptop was "intentional and in direct violation of Discovery Orders and the [Oklahoma] District Court Injunctive Order." **Exhibit 5** (AAA Sanctions Order) ¶ 12.

43. On information and belief, Mr. Bressler's spoliation was intended to conceal Defendant and Mr. Bressler's fraud and conspiracy, and was undertaken with Defendant's knowledge and urging.

### F. Defendant Fraudulently Conveys Hundreds of Thousands of Dollars After Learning that the Fund Had Discovered Her Unlawful Acts

44. On March 30, 2018, the Fund sent a letter to Defendant identifying the Fund's claims against Defendant and demanding that Defendant institute a litigation hold.

45. Defendant has admitted under oath that, with the assistance of her family (including her parents Lawrence and Dorothy Tydings) Defendant transferred hundreds of thousands of dollars into newly created trusts after receiving the Fund's letter. Despite the fact that Defendant is an experienced attorney currently practicing at Latham & Watkins, Defendant testified that she created the trusts when she received the Fund's litigation hold letter because "I feared for my life."

46. Defendant's purported fear is obvious pretext for Defendant's attempt to unlawfully shield assets that are otherwise available to satisfy the Fund's damages.

8

### G. Defendant's Knowledge of Her Husband's Fraud Is Shown by Her Conduct

47. Defendant's misconduct was instrumental to Mr. Bressler's fraud and amply demonstrates her knowledge that Mr. Bressler was defrauding his partners and investors in order to steal millions of dollars for his and his family's benefit.

48. Defendant knew that the Fund had forbidden Mr. Bressler from exercising single-signatory control over the Fund's accounts because Defendant signed the Fund's operating agreement, and reviewed and explained that agreement to her husband. **Exhibits 2-3**. Nevertheless, Defendant forged the document that allowed Mr. Bressler to wire assets out of the Fund without his partners' knowledge—an act that Defendant knew Mr. Bressler had no authorization to do.

49. Next, Defendant helped Mr. Bressler draft false representations to Carbon's investors claiming that the Fund was making substantial returns when in fact his fraudulent trading had caused substantial losses, all in order to save Mr. Bressler's job and give him a chance to trade out of the hole he had dug the Fund into. **Exhibit 4**.

50. When Carbon sent a litigation hold letter to Defendant after discovering Defendant's misconduct after the Fund's collapse, Defendant immediately created trusts and transferred assets into them to frustrate Carbon's ability to make its investors whole. Defendant then lied under oath when asked about her fraudulent transfers, absurdly claiming that Carbon's litigation hold letter caused Defendant—a lawyer at the prestigious Latham & Watkins law firm—to fear for her life.

51. Finally, when Mr. Bressler was ordered to turn over evidence that would have proved Defendant's knowledge once and for all—his personal laptop—he defied that order and instead used forensic data destruction software to irreparably destroy the data on his computer in order to protect Defendant.

52. In sum, Defendant's conduct demonstrates that she was aware of her husband's fraudulent scheme to steal millions of dollars to benefit himself and his family (including

Defendant), actively worked to advance Mr. Bressler's scheme, and aided his cover up and hiding of assets when it all came crashing down around him.

## FIRST CAUSE OF ACTION
### (Fraud)

53. The Fund incorporates by reference each and every allegation contained above as if set forth fully herein.

54. As set forth herein, Defendant misrepresented material facts to numerous entities and individuals including the Fund, its prime broker, and its investors and potential investors.

55. Defendant knew that these misrepresentations were false.

56. Defendant intended to induce reliance upon these misrepresentations.

57. The Fund and its agents were justified in relying upon Defendant's material misrepresentations.

58. The Fund suffered damages as a result of Defendant's misrepresentations—including the complete destruction of the Fund's assets—in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Fraud)

59. The Fund incorporates by reference each and every allegation contained above as if set forth fully herein.

60. As found and set forth within the final and binding Judgment issued by the District Court of Oklahoma County, Oklahoma, the Fund was a victim of an underlying fraud perpetrated by Mr. Bressler.

61. Defendant was aware of Mr. Bressler's fraud as stated herein.

62. Defendant substantially assisted Mr. Bressler's fraud as stated herein.

63. The Fund suffered damages as a result of Mr. Bressler's fraud that Defendant aided and abetted—including the complete destruction of the Fund's assets—in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Fraudulent Conveyance)

64. The Fund incorporates by reference each and every allegation contained above as if set forth fully herein.

65. Defendant made a conveyance as alleged herein.

66. Defendant's conveyance was made without fair consideration.

67. Defendant is insolvent or became insolvent as a result of the transfer.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter a judgment against Defendant as follows:

A. An award of monetary damages, along with all interest, costs, and attorneys' fees recoverable by law, in an amount to be determined at trial;

B. Disgorgement of Defendant's ill-gotten gains;

C. A constructive trust over any business or proceeds that Defendant directed from and via unlawful enterprises, including any fraudulent conveyance;

D. Punitive damages; and

E. Such other and further relief as the Court deems just and proper.

Dated: May 8, 2020  Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: _____

J. Noah Hagey, Esq. (4111357)
Jonathan Kortmansky (2704682)
Ronald J. Fisher, Esq. (*pro hac vice forthcoming*)
**BRAUNHAGEY & BORDEN LLP**
351 California Street, 10th Floor
San Francisco, CA  94104
(415) 599-0210 Telephone
(415) 276-1808 Facsimile
hagey@braunhagey.com
kortmansky@braunhagey.com
fisher@braunhagey.com

Counsel for Plaintiffs Carbon Investment Partners, LLC and Carbon Master Fund, L.P.