# BRAUNHAGEY & BORDEN LLP

San Francisco & New York

**Jonathan Kortmansky, Esq.**
kortmansky@braunhagey.com

September 28, 2020

**VIA ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

> Re:   **Opposition to Defendant's Request for Pre-Motion Conference (Dkt. 33),**
> ***Carbon Investment Partners, LLC, et al. v. Bressler*, No. 20-CV-03617 (ER)**
> **(S.D.N.Y.)**

Dear Judge Ramos:

We write on behalf of Plaintiffs Carbon Investment Partners, LLC, and Carbon Master Fund, L.P. (collectively, "Carbon" or the "Fund") in opposition to Defendant Shira Bressler's request for leave to file a motion to dismiss the First Amended Complaint ("FAC").  The well-pleaded allegations in the FAC speak for themselves:  Defendant conspired with her husband Lee Bressler to defraud the Fund by secretly risking its capital for their own benefit, so that the Bresslers could pay back a loan from their family trust to fund their lavish lifestyle. Their fraud completely destroyed the Fund and the millions in individual investors' life savings it managed. Defendant's proposed motion to dismiss merely disputes the truth of these allegations, and therefore necessarily fails as a matter of law. Leave to file that motion should thus be denied.

### A.      The FAC Alleges Defendant's Fraud in Detail

Defendant and Mr. Bressler—who lived far above their means, with homes in the Hamptons and on the Upper East Side, lavish vacations, and exclusive private schools for their children—were dependent on the Bressler family trust to finance their lifestyle. (FAC ¶ 39.)

Mr. Bressler (who was the Fund's Chief Investment Officer) relied heavily on Defendant, an experienced New York lawyer, during the drafting and negotiation of Carbon's Operating Agreement and other founding documents. (*Id.* ¶ 23.) Defendant read and edited the Operating Agreement and the Fund's private placement memorandum, and was involved in calls with the Fund's other general partners regarding fund documents. (*Id.* ¶¶ 24-32.) As such, Defendant was intimately familiar with the terms of Carbon's operating documents. (*Id.*)

Mr. Bressler borrowed $1.4 million secured by his family trust to finance his initial investment in the Fund. (*Id.* ¶¶ 2, 5, 37.) Although Carbon was a conservative, market neutral

**San Francisco**
351 California St., 10th Floor
San Francisco, CA 94104
Tel. & Fax: (415) 599-0210

**New York**
7 Times Square, 27th Floor
New York, NY 10036-6524
Tel. & Fax: (646) 829-9403

September 28, 2020
Page 2

investment fund, (*id.* ¶ 19), in May 2017 Mr. Bressler incurred significant losses by trading outside its conservative mandate, thereby losing a large portion of the $1.4 million he had borrowed. (*Id.* ¶ 37.) The Bresslers knew that their trust provided them needed liquidity, and that if the trust loan were called, they would be in financial distress. (*Id.* ¶¶ 39-40.)

Defendant – who discussed all aspects of her family's financial life with her husband – was acutely aware of the loan and her family's need to pay it off quickly. (*Id.* ¶¶ 40, 47, 49.) Worried that the family trust would foreclose on the loan, Defendant and Mr. Bressler conspired to secretly risk Carbon's capital for their own benefit and embezzle the profits in order to pay back the loan. (*Id.* ¶ 43.) As detailed in Carbon's judgment against Mr. Bressler, he set up secret trading accounts without the Fund's knowledge or approval, and implemented a scheme to siphon money out of the account without the Fund's knowledge or approval. (*Id.* ¶¶ 44-64.) Using the Fund's main account as collateral, Mr. Bressler then made a series of secret and risky trades in hopes of making profits that he could embezzle to pay back the loan. (*Id.* ¶¶ 60-64.)

To further their fraudulent scheme and empower Mr. Bressler to use ill-gotten funds to pay off the loan, Defendant signed Carbon's authorization—in the form of her husband's signature as a corporate officer of Carbon—on a document that wrongfully gave Mr. Bressler permission to wire funds from the Fund's account without the permission of the Fund. (*Id.* ¶¶ 50-51.) Because she had reviewed and commented on the Operating Agreement in detail, Defendant knew that Mr. Bressler did not have the power to make this change to a Fund account – only the Manager had such power. (*Id.* ¶¶ 52-59.) Despite this knowledge, Defendant aided Mr. Bressler fraud by signing Carbon's authorization (in the form of Mr. Bressler's signature) to a document she knew he had no right to sign: an authorization form allowing Mr. Bressler to transfer money out of the Fund's accounts without any second signature. (*Id.* ¶ 59.)

Mr. Bressler's secret trades were initially successful, and he advised the bank that the trust loan would be paid back quickly. (*Id.* ¶¶ 61-62.) But the Bresslers got greedy, and Mr. Bressler engaged in increasingly risky trades which ultimately led to the complete destruction of the Fund and its investors' capital. (*Id.* ¶¶ 63-64.) Defendant then helped Mr. Bressler draft an investor letter falsely claiming positive returns to lure additional investor money. (*Id.* ¶¶ 66-67.)

Following the Fund's collapse, Carbon sought information from Defendant regarding the Fund's destruction; her response was to fraudulently transfer hundreds of thousands of dollars to trusts to frustrate any attempts by Carbon to collect that cash. (*Id.* ¶¶ 77-81.) In an attempt to hide her participation in the fraud, Defendant refused to comply with subpoenas issued by Carbon, and fraudulently claimed attorney-client privilege over her communications with her husband, despite the fact that her employer has confirmed that Mr. Bressler was never a client. (*Id.* ¶¶ 74-75.) Meanwhile, Defendant's husband used forensic software to destroy entire hard drives to conceal her involvement in the fraud. (*Id.* ¶¶ 72-73.)

### B.    Defendant Misrepresents Carbon's Claims and Allegations

The above allegations plead Defendant's knowing participation in the fraud that destroyed Carbon. Defendant's arguments to the contrary misstate Carbon's allegations.

September 28, 2020
Page 3

      Defendant's primary contention—that she did not commit the crime of forgery—is a non-sequitur. The FAC alleges that Defendant committed civil fraud, not criminal forgery. And Carbon has alleged a fraud claim against Defendant: namely, that despite knowing that her husband did not have the authority to change the signatory requirements for the Fund's account, Defendant knowingly and purposely assisted him in doing so by falsely signing Carbon's authorization on the bank documents. Defendant did so to facilitate their conspiracy to secrete money from the Fund without Carbon's knowledge to benefit their family. That is fraud.

      Defendant further misrepresents the allegations in the FAC by claiming that Carbon's fraud claim depends upon the Operating Agreement "prohibit[ing] single-signatory control." (Ltr. at 2.) This is a red herring. The FAC does not allege that the Agreement prohibits single-signature control; rather, it explains that Carbon's Operating Agreement solely empowers the Fund's Manager (who was not Mr. Bressler) as the only person who can alter "the management and control of the conduct of the business," including making "material alterations to Carbon's account permissions." (FAC ¶¶ 56, 54.) This is dispositive. Changing a Fund account from a dual-signature to single-signature control was the type of decision that only the Manager could make, a fact Defendant knew because she had read and edited the Agreement and acknowledged in writing that she was familiar with its provisions. Yet she did so anyway.

      Rather than address these allegations, Defendant falsely portrays the FAC seeking to hold Defendant liable "simply because of her marriage." Not so. Carbon's claims against Defendant are premised not on her marriage, but on her knowing and active participation in the fraud that destroyed the Fund, fueled by her desire to protect her family's extravagant lifestyle. Defendant's implicit suggestion that a fraud claim cannot be stated unless a plaintiff appends a written admission of fraud and conspiracy to their complaint is not the law—nor could it be.

      Incredibly, Defendant's contention that the FAC fails to state a claim because Carbon has not alleged damages ignores the fact that Defendant's fraudulent scheme completely destroyed the Fund's investors' capital and left a negative balance exceeding $2 million.  That the conspirators failed in their effort to siphon money out of the Carbon accounts does not relieve them of liability for the destruction they left in their wake.

      Finally, Defendant attempts to explain away her hiding from Carbon's discovery efforts. Such excuses are issues of fact that are not appropriately resolved via a motion to dismiss, and in any event are not plausible in light of Defendants' fraudulent transfer of funds to trusts created specifically for that purpose—transfers to which Defendant has already admitted under oath.

      In sum, Carbon respectfully opposes Ms. Bressler's request for leave to file her proposed motion to dismiss because the contemplated motion must fail as a matter of law.

                    Respectfully submitted,

                    Jonathan Kortmansky