UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARBON INVESTMENT
PARTNERS, LLC, and CARBON
MASTER FUND, L.P.,

                Plaintiffs,

– against –

SHIRA ELIZABETH BRESSLER,

                Defendant.

**OPINION & ORDER**

20 Civ. 3617 (ER)

RAMOS, D.J.:

    Carbon Investment Partners, LLC and Carbon Master Fund, L.P. (collectively, "Carbon") bring this suit against Shira Elizabeth Bressler, alleging that she conspired with her husband, non-party Lee Bressler, to defraud Carbon and its investors, resulting in $12.6 million in damages. Doc. 25. Pending before the Court is Ms. Bressler's motion to dismiss Carbon's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 41.

    For the following reasons, Ms. Bressler's motion is GRANTED in part and DENIED in part.

I.    BACKGROUND

    **A. Factual Background**

    Carbon Master Fund, L.P. (the "Fund") is an Oklahoma-based hedge fund that was founded in late 2016, and was intended to be a conservative, market-neutral hedge fund with an emphasis on capital preservation. Doc. 25 ¶¶ 1, 19. Carbon Investment Partners, LLC is the general partner of the Fund. *See id.* ¶¶ 1, 10. Mr. Bressler previously worked as the Fund's chief investment officer and portfolio manager, and was tasked with managing the Fund's day-to-day trading operations. *Id.* ¶¶ 1, 13, 33. Ms. Bressler is a transactional attorney and, although she has never held a position at the

Fund, has reviewed and provided feedback to her husband on some of the Fund's legal and financial documents—even acknowledging that she had read and was familiar with the Fund's Operating Agreement during the Fund's creation. *See id.* ¶¶ 2, 22–27, 55–58.

This suit centers around Mr. Bressler's fraud against Carbon, committed in order to pay off a $1.4 million loan he obtained to finance his investment in the Fund. *See id.* ¶¶ 13–14. According to Carbon, the Fund's investment mandate included restrictions on volatility, net exposure, and position size; one of these restriction was that no more than ten percent of invested capital could be held in any single investment. *Id.* ¶ 19. The Fund also included a number of risk-management efforts over day-to-day trading operations, including that the Fund's chief risk officer frequently reviewed the Fund's primary account and discussed the investment portfolio with Mr. Bressler to ensure that it was in line with the investment mandate. *Id.* ¶¶ 33–34. These protocols, Carbon alleges, were described in numerous communications and documents among Carbon's principals, investors, and service providers—documents that Ms. Bressler also had access to and reviewed. *Id.* ¶¶ 20, 26–32.

In April or May 2017, Mr. Bressler executed trades outside of the Fund's mandate and incurred losses. *Id.* ¶ 37. In response to those losses, Mr. Bressler agreed to refrain from trading options for the foreseeable future. *Id.* Further, to cover a significant portion of the losses he incurred, Mr. Bressler took out a $1.4 million loan from Northern Trust, securing it against his family's trust. *Id.* ¶¶ 37, 49. According to Carbon, Mr. Bressler represented that this money constituted nearly 100% of his personal net worth at the time. *Id.* ¶ 38.

The Fund decided that, to insulate its limited partners, the securities obtained through Mr. Bressler's unauthorized trades should be placed in a separate account that only he and the other Carbon general partners would participate in (the "Side Pocket Structure"), thereby absorbing the losses. *Id.* ¶ 41. The only purpose of the Side Pocket

Structure was to hold and isolate those losses from the limited partners, and no limited partner chose to trade in this account. *Id.* ¶¶ 41–42.

According to Carbon, Mr. Bressler was angered by having to cover a significant portion of the unauthorized losses he had incurred. *Id.* ¶ 43. Additionally, Carbon alleges that Mr. Bressler realized that the security interest in his family trust was at risk of being foreclosed upon to satisfy his $1.4 million loan. *Id.* Relatedly, Carbon alleges that, although most of Mr. Bressler's assets had been invested in the Fund, the Bresslers continued to live extravagantly, owning residences in both Manhattan's Upper East Side and East Hampton, frequenting expensive restaurants, taking many vacations at high-end resorts, and sending their children to expensive private schools—and that these expenses were straining the Bresslers' finances. *Id.* ¶ 39. Carbon further alleges that, given the significant impact of the $1.4 million loan on the Bresslers' finances, Ms. Bressler was aware of the loan and was motivated to pay it off as soon as possible. *Id.* ¶ 40.

As a result of this financial strain, Mr. Bressler, without approval of the Fund's manager or chief risk officer,[1] used the Side Pocket Structure in late 2017 to open new trading accounts (the "Secret Accounts") with the Fund's broker. *Id.* ¶ 44. According to Carbon, the Fund's Operating Agreement required the Fund's manager to approve the opening of any new trading account. *Id.* Rather than trade with capital, Mr. Bressler and the broker traded on margin using the Fund's primary account as collateral. *Id.* Carbon alleges that Mr. Bressler traded within the Secret Accounts for his family's benefit— specifically, to pay off the $1.4 million loan. *Id.* ¶ 46. And according to Carbon, because Ms. Bressler discussed all aspects of Mr. Bressler's professional and personal financial life with him, and regularly conferred with him on financial issues—including, but not limited to, discussing in October 2016 the best structure for Mr. Bressler's family trust—

---

[1] Whereas Mr. Bressler, in his role as portfolio manager, managed the Fund's day-to-day trading operations, the Fund's manager had exclusive decision-making authority over Fund strategy, operations, brokerage accounts, and contracts. *See* Doc. 25 ¶¶ 21, 33; *see also* Doc. 25-1 at 12.

3

she also knew about his unauthorized trading through the Secret Accounts. *Id.* ¶ 47–48; *see also* Doc. 27-9. Further, because of the potential impact of foreclosure of the $1.4 million loan on the Bresslers' finances—especially on the education of their children—Ms. Bressler was well aware of the status of the loan. Doc. 25 ¶¶ 38, 49.

According to Carbon, Mr. Bressler then sought to change the Fund's signature requirement for wire fund transfers. Carbon asserts that, under the terms of the Operating Agreement, Mr. Bressler could not transfer funds on his own, and this change would allow him to transfer money out of the Fund—specifically, from the Secret Accounts—without the knowledge or consent of the Fund's chief risk officer. *See id.* ¶¶ 50–51. To effectuate this change, Ms. Bressler signed, on Mr. Bressler's behalf, documents purporting to authorize Mr. Bressler to transfer funds out of the Fund's prime brokerage account without requiring a second signature (the "Brokerage Form"), despite the Operating Agreement allegedly precluding Mr. Bressler from making such a transfer on his own. *Id.* ¶¶ 51–52; Doc. 25-23. Carbon further alleges that, given Ms. Bressler's familiarity with the Operating Agreement, she knew that Mr. Bressler was not authorized to alter this signature requirement without the approval of the Fund's seed investor or manager. Doc. 25 ¶¶ 52–57. Ms. Bressler provided a photograph of the signed form to Mr. Bressler, who then forwarded the photo to the Fund's prime broker, who in turn accepted the form. *Id.* ¶ 59; Doc. 25-24.

From January 22, 2018 to January 24, 2018, Mr. Bressler gained $4.2 million in the Secret Accounts by trading Netflix options, representing a nearly 50% increase in the assets of the entire Fund. Doc. 25 ¶ 61. According to Carbon, such a sudden increase would have been impossible under the Fund's conservative trading principles. *Id.* Mr. Bressler did not, however, inform the Fund's manager or any other member of the Fund's partnership about these gains. *Id.* On January 24, 2018, after obtaining these gains, Mr. Bressler sent an email to Northern Trust, stating that he intended to repay the entire $1.4 million in one to two weeks. *Id.* ¶ 62. After sending that email, Mr. Bressler attempted to

4

replicate his success with the Netflix trade, but his efforts resulted in the loss of the entire $4.2 million he had gained. *Id.* ¶ 63. Several unsuccessful trades followed, ultimately leading to the collapse of the Fund. *Id.*

As the Fund was collapsing, Mr. Bressler drafted an investor letter on January 29, 2018 that falsely claimed that the Fund's "returns in Q4 2017 were 7.3% net of all fees." *Id.* ¶ 66. According to Carbon, however, Mr. Bressler had lost nearly $1 million of the Fund's capital during the fourth quarter of 2017 as a result of trading in the Secret Accounts. *Id.* Carbon alleges that, just as Ms. Bressler had regularly assisted Mr. Bressler in drafting and reviewing investor letters regarding the Fund over the years, she assisted Mr. Bressler by drafting and reviewing the January 29, 2018 letter. *Id.* ¶¶ 65–66; *see also* Docs. 25-3, 25-26, 25-27, 25-28, and 25-29. According to Carbon, one of the purposes of the January 29, 2018 letter was to induce individuals to invest in the Fund so that those funds could be directed ultimately to the Bresslers, and in response to the letter, a New York City public middle school teacher invested $100,000 of his life savings. Doc. 25 ¶ 67. Meanwhile, while accruing losses in the Secret Accounts, Mr. Bressler sought to direct any assets he could to his $1.4 million loan; for example, on January 31, 2018—days before the Fund's collapse—Mr. Bressler instructed the Fund's administrator to wire $200,000 into his Northern Trust account. *Id.* ¶¶ 64, 66.

The Fund ultimately collapsed in February 2018. *Id.* ¶ 67. In the days that followed, the Fund's manager and general partnership began an investigation into the cause of its demise. *Id.* ¶ 68. Mr. Bressler, who controlled the Fund's computer systems, refused to turn over control of those systems to Carbon, and he used his administrative control to delete evidence, which Carbon alleges to have included evidence that showed Ms. Bressler had participated in the conspiracy to defraud Carbon and its investors. *Id.* ¶ 69. Carbon obtained emergency injunctive relief in Oklahoma state court against Mr. Bressler, but not before Mr. Bressler deleted or otherwise damaged significant portions of files; some, although not all, files were later restored by a forensics expert. *Id.* ¶¶ 70, 73.

Mr. Bressler then invoked an arbitration clause, sending the matter to arbitration. *Id.* ¶ 71.

On March 30, 2018, Carbon sent Ms. Bressler a litigation hold letter demanding that she preserve all relevant evidence. *Id.* ¶¶ 77–78. Immediately after receiving the letter, Ms. Bressler, with the assistance of her family, transferred hundreds of thousands of dollars into newly created trusts. *Id.* ¶ 79. Although Ms. Bressler testified that she created these trusts because she "feared for my life," Carbon alleges that she actually was attempting to shield assets that are otherwise available to satisfy Carbon's damages. *Id.* ¶¶ 80–81.

Carbon further alleges that Mr. Bressler repeatedly failed to comply with discovery orders in the arbitration and, after being ordered to turn over his laptop in March 2019, destroyed the data stored on his hard drive with forensic deletion software that rendered the data unrecoverable. *Id.* ¶ 72. According to Carbon, Ms. Bressler also defied discovery requests. For example, when served with a subpoena to testify at the arbitration, Ms. Bressler refused to comply. *Id.* ¶ 74. Carbon further alleges that, when served with a subpoena issued by the bankruptcy court supervising Mr. Bressler's bankruptcy, Ms. Bressler fraudulently claimed attorney-client privilege over communications with Mr. Bressler even though Ms. Bressler had confirmed that Mr. Bressler was never a client. *Id.* ¶ 75. According to Carbon, the arbitrator ultimately rejected this claim of privilege, but by then, it was too late to obtain meaningful discovery before the arbitration. *Id.*

On April 30, 2019, the arbitrator concluded that Mr. Bressler had breached his fiduciary duty to and committed fraud against Carbon, finding that he set up the Secret Accounts without the Fund's knowledge, put up the Fund's money as collateral for trades he was making with that account, and intended to use the profits to pay off the $1.4 million loan secured by his family trust. *See id.* ¶ 4. On June 7, 2019, an Oklahoma state

court entered a judgment confirming that award, Doc. 25-1, and that judgment has been domesticated in New York, *see* Doc. 46 at 11.

### B. Procedural History

Carbon brought this suit on May 8, 2020, asserting claims of conspiracy to commit fraud, aiding and abetting fraud, and fraudulent conveyance against Ms. Bressler.[2]  Doc. 1.  On August 19, 2020, Ms. Bressler filed a motion to dismiss the Complaint.  Doc. 18.  On September 9, 2020, Carbon filed its Amended Complaint as a matter of course, maintaining the same causes of action against Ms. Bressler.  Doc. 25.  On November 6, 2020, Ms. Bressler filed the instant motion.  Doc. 41.

## II.   DISCUSSION

### A. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

---

[2] Although labeling its first cause of action as only "fraud"—rather than "conspiracy to commit fraud"—Carbon, in its opposition, emphasizes that the allegations sound in the latter, and Ms. Bressler does not contest that characterization in her reply.  Accordingly, the Court construes Carbon's first cause of action as conspiracy to commit fraud—rather than fraud.

7

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 368 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotations omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quotation mark omitted) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

In asserting claims of fraud—including claims for aiding and abetting fraud and conspiracy to commit fraud—a complaint must "plead the circumstances that allegedly constitute fraud 'with particularity.'" *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (quoting Fed. R. Civ. P. 9(b)). Although Rule 9(b) permits a plaintiff to plead knowledge "generally," Fed. R. Civ. P. 9(b), "'generally' is merely a relative term that allows knowledge to be pleaded with less particularity than is required for the pleading of fraud." *Krys*, 749 F.3d at 129 (quotation omitted). Indeed, "'generally' is not the equivalent of conclusorily." *Id.* (quotation omitted). Thus, although Rule 9(b) allows knowledge to be averred generally, a plaintiff must still plead the events that it claims give rise to a strong inference of knowledge. *Id.*; *see also In re Platinum-Beechwood Litig.*, 426 F. Supp. 3d 14, 19 (S.D.N.Y. 2019).

## B. Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Krys*, 749 F.3d at 127 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)); *see also Oster v. Kirschner*, 77 A.D.3d 51, 55 (N.Y. App. Div. 2010). Ms. Bressler does not dispute that Carbon has satisfied the first element of this claim by alleging that Mr. Bressler defrauded Carbon by establishing the Secret Accounts and using them to execute unauthorized trades; Ms. Bressler does, however, assert that Carbon fails to satisfy the other two elements.

First, Ms. Bressler argues that Carbon has failed to sufficiently allege that she had actual knowledge of Mr. Bressler's fraud, asserting that the Amended Complaint contains only conclusory allegations that she knew about Mr. Bressler's unauthorized trades. Ms. Bressler emphasizes that the arbitration decision fails to mention her, suggesting that she had no familiarity with the fraud, and asserts that the Amended Complaint's allegation that she knew of Mr. Bressler's trading activity is based only on the October 2016 emails in which the Bresslers discuss the structure of Mr. Bressler's family trust. Doc. 27-9. Those emails, Ms. Bressler emphasizes, pre-date the alleged fraud by more than a year and do not mention the Fund. Further, Ms. Bressler argues that neither the Brokerage Form nor the Operating Agreement contains language that implies that she knew about a dual-signature requirement, as neither agreement mentions such a requirement. As to the January 29, 2018 investor letter, Ms. Bressler asserts that the Amended Complaint fails to allege that she knew that the statement about the Fund's 2017 fourth-quarter returns was false—or, for that matter, that she had any knowledge about the Fund's quarterly returns. Finally, Ms. Bressler argues that her objections to the requests for discovery in connection with the arbitration do not give rise to an inference of actual knowledge because they were made after Mr. Bressler's alleged fraud. According to Ms. Bressler,

9

because none of these allegations, either separately or together, give rise to an inference of actual knowledge, the Court should dismiss this claim.

The Court disagrees that Carbon has failed to plausibly allege Ms. Bressler's actual knowledge. "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law." *Krys*, 749 F.3d at 127 (quoting *Lerner*, 459 F.3d at 293). "[U]nder New York law, "a complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads 'not . . . constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances.'" *Id.* (quoting *Oster*, 77 A.D.3d at 56). Of course, often "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud," *see Oster*, 77 A.D.3d at 55–56, so New York courts have emphasized that actual knowledge need not be based on an explicit acknowledgement of the fraud but can be inferred from the allegations in a complaint, *see Krys*, 749 F.3d at 127; *see also In re Platinum-Beechwood Litig.*, 426 F. Supp. 3d at 19–20; *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018).

At a minimum, Carbon's allegations regarding Ms. Bressler's familiarity and involvement with correspondence and legal documents relating to the Fund give rise to the inference of her actual knowledge of Mr. Bressler's fraud. Certainly, some general familiarity with another person's or entity's finances, by itself, does not give rise to a sufficient inference of actual knowledge, as a plaintiff must allege that the defendant specifically knew about the fraudulent scheme. *See Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 630–31 (2d Cir. 2020) (summary order). But here, Carbon has pleaded the events that it claims give rise to an inference of knowledge of the underlying fraud. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12 Civ. 3723 (RJS), 2016 WL 5719749, at *5 (S.D.N.Y. Sept. 29, 2016) (citing *Krys*, 749 F.3d at 129).

Three cases are instructive for the Court's analysis. First, the court in *Loreley* concluded that the plaintiffs in that case sufficiently alleged facts establishing actual

knowledge. *Id.* In that case, the plaintiffs were entities that invested in collateralized debt obligations that eventually defaulted, and two defendants served as collateral managers for those obligations. *Id.* at *1. Those collateral manager defendants selected high-risk assets at the behest of a hedge fund that invested heavily in credit default swaps and, accordingly, stood to gain significantly from the failure of the obligations. *Id.*

As to actual knowledge, the court noted that the plaintiffs alleged that the collateral manager defendants dumped toxic collateral into the obligations at the behest of the fraud principals. *Id.* at *5. At the same time, the plaintiffs alleged that the collateral manager defendants were aware of misrepresentations in marketing documents authored by one of the fraud principals; those documents stated that the collateral manager defendants—not the hedge fund—were in charge of selecting assets and emphasized a conservative investment approach, contrary to the risky approach actually taken with the obligations. *Id.* at *4–5. From these allegations, the court concluded there was a sufficiently strong inference that the collateral manager defendants knew that the representations in marketing materials were materially misleading—*i.e.*, that they actually knew about the fraud. *Id.* at *5.

Second, the court in *Oster* also concluded that the allegations established actual knowledge. 77 A.D.3d at 56. In that case, the plaintiffs sued various attorneys, claiming that they had aided and abetted a Ponzi scheme, whereby the principals were able to perpetrate fraud that resulted in over $22 million in losses. *Id.* at 52. More specifically, the plaintiffs alleged that the attorneys drafted memoranda and furnished other legal services, such as serving as an escrow agent for transactions in furtherance of the scheme. *Id.* at 53. According to the plaintiffs, the memoranda failed to disclose the principals' criminal histories, including restrictions from participating in the securities industry. *Id.* at 54. Notably, the principals used these memoranda to solicit funds in furtherance of their Ponzi scheme. *Id.* at 54–55.

11

The court held that the plaintiffs had sufficiently alleged that the attorneys had actual knowledge of the alleged fraud perpetrated by the principals. *Id.* at 56. Although the attorneys asserted "that they did nothing more than draft [the memoranda] for a client, and that any misrepresentations contained therein [were] irrelevant to the question of whether they had actual knowledge" that the principals operated a Ponzi scheme, the court emphasized that the attorneys' experience and familiarity with the clients and the attorneys' knowledge of the misrepresentations in the memoranda—which served as the vehicle by which investment in the Ponzi scheme was carried out—established actual knowledge. *Id.* at 55–56.

Third, and by contrast, the Second Circuit in *Hienert* concluded that the plaintiffs failed to sufficiently allege actual knowledge. 835 F. App'x at 630–31. In that case, plaintiffs sued a number of individual defendants and two banks, alleging that the banks had aided and abetted the individual defendants in a Ponzi scheme. *Id.* at 629. According to the plaintiffs, the banks had acquired actual acknowledge of the alleged fraud through their interactions with the individual defendants, who banked at local branches of the banks. *Id.* at 630. In particular, the plaintiffs had alleged that the banks' employees had opened more than 120 accounts for the individual defendants over a nearly ten-year span, and that the individual defendants used these accounts for various shell companies and rapidly shuffled money among them to cover low or negative balances, commingling investor funds in the process and transferring funds to their personal accounts. *Id.* The plaintiffs asserted that actual knowledge could be inferred from allegations stating that a bank employee (1) lifted automatic, multi-day holds on large deposits; (2) made false representations to a creditor to assure it that the account of one of the individual defendants contained sufficient funds to cover high monthly balances; and (3) solicited and received bribes from the individual defendants. *Id.*

However, the Second Circuit disagreed that such allegations gave rise to the strong inference necessary for actual knowledge. *Id.* In reaching that conclusion, the

12

Second Circuit emphasized that the plaintiffs failed to allege that the banks or their employees knew about the individual defendants' fraudulent scheme, noting that plaintiffs never alleged (a) that the banks or their employees provided investors with promissory notes that they would not honor, (b) that they misrepresented how funds would be invested or transferred, or (c) that they falsely stated returns about the investment companies. *Id.* Moreover, the plaintiffs never alleged that the banks' own investigations revealed any evidence of the individual defendants' Ponzi scheme. *Id.* at 631. Accordingly, the Second Circuit concluded that the allegations did not suffice to show that the banks had actual knowledge of the scheme. *See id.*

Taken together, these cases indicate that, while general familiarity of a principal's financial circumstances cannot give rise to a strong inference of actual knowledge, allegations of knowledge of the specific financial circumstances at issue in the alleged fraud can give rise to a sufficiently strong inference. That inference is further supported when a defendant, having such knowledge, helps prepare documents that serve as the vehicles by which the fraud is perpetrated.

Here, while a statement that Ms. Bressler knew of Mr. Bressler's unauthorized trading, by itself, would be conclusory for the purpose of Rules 9(b) and 12(b)(6), Carbon has alleged more. Specifically, Carbon has also alleged that Ms. Bressler regularly reviewed and substantively revised various legal documents for the Fund and correspondence conveying information to investors, giving rise to the inference that she was familiar with the operations of the Fund. *Loreley*, 2016 WL 5719749, at *5; *see also Nathel v. Siegal*, 592 F. Supp. 2d 452, 469–470 (S.D.N.Y. 2008). Moreover, Carbon alleges that Ms. Bressler helped draft several of these letters despite knowing that they were false. *See Oster*, 77 A.D.3d at 55–56; *Heinert*, 835 F. App'x at 630–31. Further, Carbon alleges that, given the Bresslers' regular discussions about finances, and about Mr. Bressler's trust specifically, Ms. Bressler was aware of the influence of the $1.4 million loan on Mr. Bressler's decisions relating to the fraud. While Ms. Bressler is

correct that the October 2016 emails about the structure of the Fund predate the alleged fraud by over a year, Carbon includes that letter simply as an example of Ms. Bressler's familiarity with Mr. Bressler's finances, and the Amended Complaint alleges more broadly that the Bresslers regularly had discussions about their finances and the trust. Taken together, these allegations indicate that Ms. Bressler knew about the Fund's operations and its mandates, Mr. Bressler's motivation regarding the $1.4 million loan, and his fraudulent efforts made to repay that loan. Accordingly, the Court concludes that the Amended Complaint alleges sufficiently detailed facts giving rise to the strong inference of actual knowledge.

Second, Ms. Bressler argues that Carbon has failed to allege that she substantially assisted Mr. Bressler's alleged fraud. "Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing [to] act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated"—that is, the injury must be a direct or reasonably foreseeably result of the conduct. *Berman v. Morgan Keegan & Co., Inc.*, 455 F. App'x 92, 96 (2d Cir. 2012) (summary order) (quotation omitted); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018). Substantial assistance can take many forms, including "[e]xecuting transactions or helping a firm to present an enhanced financial picture to others." *Silvercreek*, 346 F. Supp. 3d at 487 (quotation omitted). Further, courts in this District have noted that, "[w]here the underlying fraud claim is 'predicated on misrepresentations in documents, substantial assistance usually involves assistance in the preparation or dissemination of the documents.'" *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 386 (S.D.N.Y. 2010) (quoting *Nathel*, 592 F. Supp. 2d at 470); *see also Silvercreek*, 346 F. Supp. 3d at 487.

Ms. Bressler argues that Amended Complaint fails to satisfy both prongs for substantial assistance. Regarding the first prong, Ms. Bressler asserts that the Amended Complaint contains no particularized allegations that show she was involved in her

14

husband's trading activities.  Further, according to Ms. Bressler, the Brokerage Form permitted Mr. Bressler only to wire money from the Fund's primary account to a Fund investor, meaning that it had nothing to do with Mr. Bressler's trading in the Secret Accounts.  Moreover, Ms. Bressler emphasizes that she signed Mr. Bressler's name on that form only at his express request and provided the form only to him, barring any conclusion that the fraud was facilitated.  Similarly, Ms. Bressler notes that she shared her edits regarding the January 29, 2018 investor letter with only Mr. Bressler, and in any event, the edits that she recommended are not alleged to be false.  Finally, Ms. Bressler again notes that her objections to the requests for discovery in connection with the arbitration occurred after the alleged fraud, and argues therefore that her objections could not assist the alleged fraud because the Fund had already collapsed by the time she made them.

The Court disagrees that Carbon has failed to satisfy the first prong at this juncture.  Regardless of whether Mr. Bressler was authorized to sign the Brokerage Form, Carbon alleges that Ms. Bressler signed the form so that Mr. Bressler could wire money out from the Fund that he earned as a result of his trading through the Secret Accounts.  By signing on Mr. Bressler's behalf, and with the knowledge that he was conducting trades through the Secret Accounts so that he could withdraw money with the authority derived from this form, Ms. Bressler affirmatively assisted Mr. Bressler in a manner that enabled him to continue trading with the Secret Accounts—*i.e.,* his alleged fraud.

Relatedly, Carbon alleges that Ms. Bressler assisted in drafting the January 29, 2018 investor letter that materially misrepresented the Fund's strategy and performance, and alleges that the letter was used to solicit more funds in furtherance of Mr. Bressler's alleged fraud.  Ms. Bressler's argument that her edits were shared only with Mr. Bressler, thereby barring any conclusion that she substantially assisted him, is unavailing.  After all, the letter is addressed to the Fund's investors, Doc. 25-29 at 3, and Mr. Bressler distributed the letter to the investors after incorporating edits by Ms. Bressler.  Thus, the

allegations indicate that Ms. Bressler knew the letter, with her edits, would be disseminated to investors, and in such circumstances, courts have concluded that substantial assistance has been sufficiently pleaded. *See Silvercreek*, 346 F. Supp. 3d at 487; *see also IMG Fragrance*, 759 F. Supp. 2d at 385–86; *Oster*, 77 A.D.3d at 56–57. Likewise, Ms. Bressler's argument that her edits were not false is unpersuasive. Again, the inquiry under the first prong is not whether Ms. Bressler herself committed fraud; rather, the inquiry is whether Ms. Bressler took actions that enabled the fraud, which the Court has already concluded the Amended Complaint sufficiently alleges. *See Oster*, 77 A.D.3d at 57; *see also Nathel*, 592 F. Supp. 2d at 470. Accordingly, the Court concludes that the Amended Complaint satisfies the first prong of the substantial assistance test.

Regarding the second prong—proximate causation—Ms. Bressler argues that the Amended Complaint fails to allege facts establishing that she proximately caused any of Carbon's losses that resulted from Mr. Bressler's unauthorized trades in the Secret Accounts. To that end, according to Mr. Bressler, the Amended Complaint does not allege that her conduct ever resulted in money actually being transferred to the Bresslers from the Secret Accounts, nor does it allege that the January 29, 2018 letter caused an investor to make an investment in the Fund. And as to her objections in the arbitration proceeding, Ms. Bressler contends that those objections cannot serve to support causation because they were made after the alleged fraud. Thus, according to Ms. Bressler, Carbon has failed to establish proximate causation.

The Court again disagrees. It is reasonably foreseeable that Ms. Bressler's assistance obtaining transfer authorization—which would have permitted Mr. Bressler to withdraw any proceeds he made from his trading with the Secret Accounts—enabled him to further his scheme. *See Nathel*, 592 F. Supp. 2d at 470. Indeed, without the ability to withdraw money from the Fund, there would have been no purpose to Mr. Bressler's alleged fraud. *See id.*; *see also Silvercreek*, 346 F. Supp. 3d at 487–88. Further, as Carbon notes, no money was ever transferred from the Secret Accounts because it

collapsed before Mr. Bressler could make those transfers; again, according to the Amended Complaint, that collapse resulted because of Mr. Bressler's trading with the Secret Accounts.  Additionally, and contrary to Ms. Bressler's assertion, Carbon does allege that the January 29, 2018 letter induced at least one individual to invest $100,000 that was ultimately lost as a result of the Fund's collapse, Doc. 25 ¶ 67, and it was reasonably foreseeable that such an investment would be made in response to that letter's representations.  See *Silvercreek*, 346 F. Supp. 3d at 487; *Nathel*, 592 F. Supp. 2d at 470.  Accordingly, the Court concludes that Carbon has sufficiently pleaded allegations to show substantial assistance and, therefore, a claim for aiding and abetting fraud.[3]

### C. Conspiracy to Commit Fraud

Under New York law, to establish a claim of civil conspiracy to defraud, a "plaintiff must demonstrate the underlying tort—here, fraud—plus the following four elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a common purpose or plan; and, (4) resulting damage or injury." *Silvercreek*, 346 F. Supp. 3d at 499 (alterations omitted) (quoting *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 659 (S.D.N.Y. 2015)).  In other words, a plaintiff must establish facts that "support an inference that defendants knowingly agreed to cooperate in a fraudulent scheme, or shared a perfidious purpose." *IMG Fragrance*, 759 F. Supp. 2d at 386 (quoting *Snyder v. Puente De Brooklyn Realty Corp.*, 297 A.D.2d 432, 435 (N.Y. App. Div. 2002)).

Ms. Bressler asserts that a claim for civil conspiracy is duplicative of an aiding and abetting fraud claim and therefore should be dismissed.  As an initial matter, Carbon argues that Ms. Bressler has waived this argument because she placed it in a footnote in her opening brief.  See Doc. 42 at 28 n.3.  Of course, Carbon is correct that a claim

---

[3] Ms. Bressler also argues that Carbon has deliberately refused to allege facts that would refute the allegations in the Amended Complaint relating to the Brokerage Form, and details them in her briefing. However, the Court cannot consider such averments when reviewing a motion to dismiss pursuant to Rule 12(b)(6) and, accordingly, declines to do so.  See *Nielsen*, 746 F.3d at 62.

cannot be dismissed simply based on perfunctory musings in an opening brief's footnote. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012); *see also Gramercy Advisors, LLC v. Ripley*, No. 13 Civ. 9070 (VEC), 2014 WL 5847444, at *2 (S.D.N.Y. Nov. 12, 2014). However, regardless of whether the argument was made in a footnote, the Court finds that Ms. Bressler has sufficiently addressed the issue, as she has put forth an argument that, while short, fully addresses the merits of whether Carbon's civil conspiracy claim is duplicative.

"Under New York law, a cause of action for 'conspiracy may be alleged to connect a defendant' to a sufficiently pleaded tort claim, but plaintiffs may not 'reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim.'" *Loreley*, 2016 WL 5719749, at *7 (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 591 (2d Cir. 2005)). As such, "a cause of action for civil conspiracy that 'offers no new allegations beyond those alleged in support of' other tort claims alleged elsewhere must 'be dismissed as duplicative.'" *Id.* (quoting *De Sole*, 974 F. Supp. 2d at 315) (collecting cases); *see also In re Platinum-Beechwood Litig.*, 426 F. Supp. 3d at 21. Here, the claim for civil conspiracy, just like the claim for aiding and abetting fraud, "seeks to hold [Ms. Bressler] secondarily liable for the underlying tort—primary fraud—committed by" Mr. Bressler, as evidenced by Carbon's reliance on the same allegations for both claims. *In re Platinum-Beechwood Litig.*, 426 F. Supp. 3d at 21 (footnote omitted). Accordingly, Carbon's conspiracy claim is entirely duplicative and will be dismissed with prejudice. *Id.*; *see also Loreley*, 2016 WL 5719749, at *7–8.

### D. Fraudulent Conveyance

Finally, Ms. Bressler argues that Carbon's claim for fraudulent conveyance should be dismissed because Carbon does not allege that it is a creditor of Ms. Bressler. According to the Amended Complaint, after receiving a litigation hold on March 30, 2018, Ms. Bressler transferred hundreds of thousands of dollars into newly created trusts that could have been used to satisfy any potential judgment. Doc. 25 ¶¶ 78–81. Carbon

18

asserts that such actions constitute fraudulent conveyance pursuant to New York Debtor and Creditor Law § 273.[4]

Under New York law, "[t]o bring a cause of action for fraudulent conveyance, 'the plaintiff must be a creditor of the transferor of the alleged fraudulent conveyance.'" *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 465 (S.D.N.Y. 2018) (quoting *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006)). The New York Debtor and Creditor Law defines "creditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *See* N.Y. Debt. & Cred. Law § 270; *see also DoubleLine*, 323 F. Supp. 3d at 465. Further, section 275 of the Debtor and Creditor Law states that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 275. However, New York courts have held that section 273 is not applicable to future creditors; in other words, a person is a "creditor" for the purpose of section 273 only if that person's cause of action against the transferor arises prior to the transferor's conveyance. *See DoubleLine*, 323 F. Supp. 3d at 465 (collecting cases).

Here, Carbon's cause of action for aiding and abetting fraud arose when the Fund collapsed—*i.e.*, February 2018. Because Carbon's claim arose prior to Ms. Bressler's conveyance on March 30, 2018, and because she has not otherwise challenged Carbon's

---

[4] The Court notes that the sections of the New York Debtor and Creditor Law relevant to the instant suit "have been repealed and replaced—effective April 4, 2020—by an act of the New York legislature approved on December 6, 2019." *Ray v. Ray*, 799 F. App'x 29, 31 (2d Cir. 2020) (summary order). Those new provisions, however, do "'not apply to a transfer made or obligation incurred before' the act's effective date, 'nor shall [they] apply to a right of action that has accrued before [that] effective date.'" *Id.* (quoting 2019 N.Y. Sess. Laws Ch. 580). Because Carbon's cause of action arose prior to this new legislation, the prior versions of sections 270, 273, and 275 of the New York Debtor and Creditor Law apply.

19

claim for fraudulent conveyance, the Court denies Ms. Bressler's request to dismiss this claim.

### III. CONCLUSION

For the foregoing reasons, Ms. Bressler's motion is GRANTED with prejudice as to Carbon's claim for civil conspiracy to commit fraud but otherwise DENIED. The requests for oral argument are DENIED as moot. Docs. 42 and 48. Ms. Bressler is directed to file her answer by September 22, 2021. The Clerk of Court is respectfully directed to terminate the motion. Doc. 41.

It is SO ORDERED.

Dated:   September 1, 2021
         New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.